Filed 3/26/21  P. v. Cavasso CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Modoc)

----

| | |
|---|---|
| THE PEOPLE, | C083931 |
| Plaintiff and Respondent, | (Super. Ct. No. F15461) |
| v. | |
| BRIAN ENRI CAVASSO, | |
| Defendant and Appellant. | |

SUMMARY OF THE APPEAL

A jury found defendant Brian Enri Cavasso guilty of selling crystal methamphetamine and furnishing marijuana to an informant.  On appeal, defendant raises numerous claims challenging his conviction and the trial court's denial of his motion for a new trial.

1

Defendant argues: (1) his conviction for the sale of methamphetamines was not supported by sufficient evidence, because the People did not have the substance he sold to the informant tested at a crime laboratory; (2) an expert who testified for the People improperly relied on case-specific and testimonial hearsay evidence; (3) the Modoc County District Attorney, who prosecuted this case, had a conflict of interest and should not have been able to participate because, before he was elected DA, he had represented the key informant in this trial; (4) the People committed a *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*)) because the prosecution failed to tell the defense about a possible percipient witness to the transaction who had a record of selling methamphetamine; (5) he was denied a fair trial because the District Attorney committed prosecutorial misconduct; (6) the trial court abused its discretion when it did not grant his motion for new trial on the grounds that after the trial the informant asked the District Attorney to dismiss a case against his girlfriend; (7) he was denied effective assistance of counsel the trial court should have granted his request for a new trial; and (8) the cumulative impact of the other alleged errors denied him a fair trial.

None of defendant's arguments have merit. We affirm the trial court's judgment and its ruling on the motion for a new trial.

FACTS AND PROCEDURAL HISTORY

*The Informant*

A.J. Pfeiffer has been addicted to methamphetamine since he was about 16 years old. He had also sold methamphetamine. In September 2014, Pfeiffer was on probation. Sergeant Michael Main and others conducted a search of Pfeiffer's residence and found a glass methamphetamine smoking pipe. Main permitted Pfeiffer to "work off" the violation and stay out of jail. Pursuant to their agreement, Pfeiffer would perform one or more controlled drug buys for Main.

2

*Events of January 28, 2015*

In the early afternoon on January 28, 2015, Pfeiffer bought what he believed to be crystal methamphetamine from defendant. He took it home and hid it in his yard to use later.

That evening, Pfeiffer got in touch with Main about performing a controlled buy. Main then talked to then Deputy Sheriff William Dowdy.

At about 9:30 p.m., Main, Dowdy, and Pfeiffer met at an undisclosed location. Main searched Pfeiffer to be certain he did not have any controlled substance or money on him. Dowdy searched Pfeiffer's pickup truck. Neither Main nor Dowdy found drugs or money. Dowdy gave Pfeiffer a tape recorder, and marked money. Pfeiffer said he was going to try to buy methamphetamine from defendant. Pfeiffer did not tell Main or Dowdy that he had purchased methamphetamine from defendant earlier in the day.

Pfeiffer, followed by Main in a marked car and Dowdy in an unmarked vehicle, drove his truck to defendant's residence, but defendant was not home. Pfeiffer called defendant, and defendant told Pfeiffer to meet him at an auto shop. On the second page of the 16-page transcription of the audio recording from that night, one person asks another, "[y]ou want me to come by the shop?" And another person answers, "[y]eah."

After he left the first stop, Pfeiffer drove to a residence with a detached shop where he got out of his truck and went into the shop.

Pfeiffer said defendant met him at the door of the shop, with the door already open. On the audio recording, much of the dialogue that first occurred at the shop is unintelligible. Pfeiffer claims he spoke with defendant about methamphetamine. There were other people in the shop. Pfeiffer testified he did not know who they were, and that the conversation about the methamphetamine was kind of "hush-hush." Pfeiffer testified he and defendant were standing in front of a flatbed truck when they made their transaction, and the other two people were squatted on the ground behind the truck. He

3

did not believe the other two men could see what he and defendant were doing. Pfeiffer testified that he paid defendant money that he owed him from the purchase he made earlier in the day and an additional amount for a new bindle of methamphetamine. On the audio, one person said to another, "[n]ow we're talkin,' this is my forte," and, shortly thereafter, "[w]hattya want for it?" Pfeiffer claimed defendant also gave him some marijuana he had not asked for.

Beginning on the fourth page of the transcript taken from the recording Pfeiffer made during the transaction, which appears to reflect when a second conversation in the shop occurred, the transcription suggests the dialogue is a little, but not much, clearer than what was recorded of the first conversation. There is what appears to be an introduction of Pfeiffer and the two other men: "Marshall, Jeff, AJ." Then the various men chat about why they might recognize each other, and something that needs to be "beat" or possibly "hit [on] both sides" and a "receiver."

Pfeiffer left, and Pfeiffer, Main, and Dowdy returned to the undisclosed location. Pfeiffer gave the officers the tape recorder, the bindle of what he believed was crystal methamphetamine--at trial, Pfeiffer indicated that a bindle is a convenient way to package methamphetamine--and the marijuana. Main searched Pfeiffer's person and truck and found nothing. When discussing what happened inside the shop, Dowdy and Pfeiffer had the following exchange regarding the other people:

"Q [Dowdy]: And who was there?

"A [Pfeiffer]: There [*sic*] names are on there-I can't.

" . . .

"Q: What did one guy look like?

"A: There's an older guy with a bald head and then a younger kid.

"Q: What's the younger kid look like?

"A: Uh, bald head, little taller than me, stocky. There [*sic*] in there tryin' to tear apart a fuckin' trailer (unintelligible).

4

"Q: (Unintelligible) White?

"A: White, they're all White.

"Q: Okay. The old guy, he kinda limp?

"A: Yeah.

" . . .

"Q: You got any--you notice anything about his head?

"A: A scar.

"Q: Okay. And what about the other guy?

"A: Young kid.

"Q: And his name is on there?

"A: He was in jail with me--yeah.

"Q: Okay."

Pfeiffer left the meeting and later used the methamphetamine he had purchased from defendant earlier in the day. It made him high.

Dowdy determined the bindle Pfeiffer gave him contained approximately one-half gram of substance. Dowdy tested a portion of the substance using a NARK II test kit. The test came back positive for methamphetamine. The People did not obtain additional test results from a crime laboratory.

*Complaint and Preliminary Hearing*

In June 2015, Dowdy completed his investigative report regarding the sale of methamphetamine. In December 2015, the People filed a complaint, later deemed an information, alleging two counts. Count one charged defendant with the felony sale of methamphetamine, in violation of Health and Safety Code section 11379, subdivision (a). Count one also set forth a special further allegation that, pursuant to Penal Code section 1170.74 the methamphetamine was in crystalline form. (Statutory section references that follow are found in the Penal Code unless otherwise stated.)

At the preliminary hearing in April 2016, Dowdy said that Pfeiffer had informed him that there were others besides himself and defendant present when he purchased methamphetamine from defendant. However, Dowdy's report did not include the names of the other people who were present because "it was [Dowdy's] recollection that [Pfeiffer] didn't know these individuals . . . enough to provide [him] with specifically who they were." When asked at the preliminary hearing if he knew who the other people present were, Dowdy responded, "I don't. I don't. No."

Though at the preliminary hearing defense counsel referred to the audio recording from the transaction as muffled, he also said in questioning that one could tell "from the sounds of this audio," that Pfeiffer is a "fairly foulmouthed guy."

### The Trial

Trial began on May 11, 2016. Main, Pfeiffer, and Dowdy testified as witnesses to the events on January 28, 2015. In addition to serving as a witness to some of the events of January 28, 2015, Dowdy testified as an expert for the People on the investigation and identification of methamphetamine and marijuana. The defense did not object to his expertise in the investigation of methamphetamine and marijuana, but it had a continuing objection to Dowdy testifying on the results of the NARK II test kit and to introducing the results of that test at trial.

Because when and how certain statements made by Dowdy and Pfeiffer regarding the NARK II test, the identity of the people in the shop during the transaction, and possible leverage the People had to compel Pfeiffer's testimony are relevant to multiple arguments raised in this appeal, we provide more specific detail regarding their testimony on those subjects here.

### Direct of Pfeiffer

On direct examination, Pfeiffer testified that when the pipe was found in his home, he was on probation for the crimes of selling methamphetamine and second degree

6

burglary.  At the People's prompting, he testified that Modoc County District Attorney Jordan Funk (DA Funk), who served as the prosecutor at trial, had served as his counsel on that case, he had pleaded guilty to possession of methamphetamine with intent to sell and second degree burglary, and he was sentenced to a year in county jail and placed on probation.  On the day he testified, Pfeiffer was serving a prison sentence that was set to end in two days.  That prison sentence was due to a probation violation.

The People elicited testimony from Pfeiffer that a "snitch" is "somebody who tells on someone," being labeled a snitch if you are in and out of the justice system is not a good thing, and in the drug culture you never want to be labeled as a snitch.

The People asked Pfeiffer if anyone offered him any benefit or if he was aware of any benefit to himself for testifying, and he said no.  The People asked if anyone offered him anything in exchange for his testimony in the case, and he said no.  When asked why he was willing to testify in a manner that might get him labeled as a snitch, defendant responded, "I've been in and out of the system since I was, like, 16, 17, and 18 years old.  Prison twice.  County jail most of my young adult life.  And I'm tired of it.  Trying to turn it around."  He had two children he had not seen in over a year.

### Cross Examination of Pfeiffer

On cross examination, Pfeiffer indicated he had been satisfied with DA Funk's services as his counsel in 2012.  Pfeiffer admitted that he has a number of felony convictions.  Pfeiffer admitted that he has lied to law enforcement about his actions in the past.  He admitted that on the Monday before the trial DA Funk and Dowdy went to the jail and visited with him, and they discussed that he would be testifying in this case.

### Redirect of Pfeiffer

On redirect, the People further explored Pfeiffer's meetings with DA Funk and Dowdy regarding the case.  Pfeiffer admitted DA Funk had gone to see him twice.  Dowdy was at the first meeting.  Just before Pfeiffer testified, when he was in a holding

7

cell, DA Funk met with Pfeiffer and told him to "[b]e honest, [and] not lie." DA Funk told Pfeiffer to be honest and tell the truth more than once. DA Funk told him to be as accurate as he could be.

### *Direct Examination of Dowdy*

Dowdy was the last witness the People called. To qualify Dowdy as an expert, the People asked him questions about his experience and training as a peace officer. At the time of trial he was the Undersheriff of Modoc County. He had been a peace officer for approximately 15 years. He was a task force commander on the Modoc County Interagency Narcotics Task Force from 2010 to about the end of 2013, when it was disbanded. He has received special training in the investigation of cases involving illegal drugs. In 2005 he received training when he was assigned a dog that was trained specifically to sniff out illegal drugs. He attended a clandestine lab class in 2005, which was two weeks long, and was about the manufacturing of methamphetamine and how to eradicate super labs. As part of that course, he was shown the methamphetamine manufacturing process. At some point, he went with a group of other attendees to a lab, where they assisted in manufacturing methamphetamine, and he got to play a minimal part by adding a component to the chemicals. He attended another 80-hour course in 2010, where he learned about undercover operations, handling informants, and packaging various types of drugs, including marijuana and methamphetamine. He has testified in court more than 50 times. He has testified as an expert on whether a quantity of marijuana or methamphetamine is usable. Prior to this case, he had not testified as an expert on the use of the NARK II presumptive test, but he has testified about the results of a NARK II presumptive test.

Dowdy further described his experience with the NARK II testing kit, a test used by peace officers to presumptively identify illegal drugs. He described a NARK II test kit as a small test kit, where you take a small amount of a substance you believe to be an

illegal drug and put it in the appropriate kit. The kits contain chemicals that when mixed with a specific drug will give a specific color reaction, and that helps you determine if the substance is what you believe it to be. He has run presumptive methamphetamine tests using NARK II kits hundreds of times during his career.

The People had Dowdy open a NARK II test kit and explain how to use it when he testified. He indicated you take a stick provided with the test and use that to put some of the substance at issue into a container. You close the container then break three ampules containing chemicals into the container. If the sample and chemicals in the ampules mix together and you get a dark blue color, that tells you the substance you put in the kit is methamphetamine. There have been some instances where he has tested a substance he thought was methamphetamine, and the NARK II test indicated it was not. He is very confident that with the NARK II test he can tell the difference between a substance that contains methamphetamine and one that looks like it contains methamphetamine but does not.

After testing and logging evidence that is a suspected drug, Dowdy often waits for a district attorney to request he send it to a crime lab for further testing. Sometimes they wind up sending the substance to a crime lab and sometimes they do not. Dowdy has never sent a substance for which he obtained a positive presumptive test for methamphetamine to a crime lab and received a result back from the lab saying it was not methamphetamine. He believes he has sent methamphetamine to a lab when he has already performed a presumptive test more than 50 times.

With respect to the bindle Pfeiffer gave Dowdy on January 28, 2015, Dowdy performed a presumptive test on it, and he was very confident that it contained methamphetamine.

Dowdy brought the bindle Pfeiffer gave him to court, opened it, looked at it, and stated it was crystal methamphetamine.

9

The People asked Dowdy to assume the following facts: "Pfeiffer bought from Brain Cavasso earlier in the day on January 28th, a substance the he believed was methamphetamine; that he stashed that substance in his yard; used it later that night and got high.

"[F]urther assume that then in the evening of January 28th, Mr. Pfeiffer gave to you the bindle that's been identified as People's 8C [and] claimed that it came from Mr. Cavasso. Assume further that you tested that methamphetamine with a NARK II presumptive test; furthermore, that you looked at it, physically examined it, and that you got a color result that showed that that substance in 8C tested positive for methamphetamine. [¶] Do you have an opinion as to whether or not those crystals in that bindle are methamphetamine or contain methamphetamine?"

After a discussion regarding an objection to the question made by the defense, the court directed Dowdy that he could "answer the question," and asked, "[d]o you recall the question?" Dowdy responded, "I believe if I believe that that was methamphetamine; is that correct?" And the People added, "[a]nd does your opinion that this is methamphetamine, does it also include your experience with the fact that you've never had a presumptive NARK II methamphetamine result, presumptive positive, does your opinion include the fact that you've never had a presumptive positive contradicted by laboratory testing?" To which Dowdy responded, "[t]hat's true."

During Dowdy's testimony describing the events of January 28, 2015, the People played the audio recording. Dowdy recognized his voice, Main's, and Pfeiffer's. He could not identify other voices on the recording.

When the People got to the portion of the recording where Dowdy was asking Pfeiffer about who was present in the shop during the methamphetamine purchase, the following exchange occurred:

"Q (By [DA] FUNK)        . . . . [¶] The old guy, you're asking about a limp and a scar, do you know who that described?

10

"A  I was leading to a particular person at the time.

"Q  Are you able to disclose who you thought that might be?

"A  I believed it was Jeff Larsen.

"Q  Let me ask, is Jeff Larsen someone that – [¶] . . . [¶]

"MR. KYLLO:  Objection, relevance at this point.  We haven't been provided any discovery about this.

"THE COURT:  Why do we care about people who were there who are not in-- apparently allegedly involved in the transaction?

"MR. FUNK:  You never know what a jury is going to find important.  I thought it curious that Deputy Dowdy-- . . . Undersheriff Dowdy might know who one of the parties were.  I wanted to ask him who that person was, whether that person was involved in methamphetamine sales, that sort of thing.  If the Court deems it not relevant, I won't inquire.

"THE COURT:  I think it's not relevant, I think it unduly takes up time on irrelevant matters.

"And it's speculative because we don't know, at least I haven't heard that there has been any verification of who was there. . . .  Mr. Pfeiffer testified that no one else was involved who was there, or knew even what was going on, he thought, according to what was there.  And so I'm not particularly interested in dragging the name of another person, who may not have been involved in any illegal transactions, into the case.

"MR. FUNK:  Okay."

Defense counsel said nothing further on the matter and did not make a request to suspend the trial to allow him to investigate Larsen's possible presence at the transaction and what he might have observed.

The People asked Dowdy if he had "any kind of leverage over Mr. Pfeiffer, if he did not want to come in and tell the truth" at trial.  Dowdy responded, "[n]one whatsoever, I have--we have no pending cases."

11

*Cross Examination of Dowdy*

On cross-examination, Dowdy admitted he does not work for the company that prepares the NARK II test kits and he is not a chemist. He acknowledged he has to follow instructions to do the test "until you understand how to do it." Defense counsel then marked Defense Exhibit A, which appears to be a flyer or instructions included with the NARK II test kits, and was later entered into evidence. He also referenced a NARK II test kit that had been admitted earlier. The following exchange occurred:

"Q [by the defense] So the item of evidence states, 'Caution. Read instructions before using;' is that right? And I'm assuming you've done that.

"A Oh, yeah, I've read the instructions in the past.

"Q And the instructions include a caveat about the use and the limits of a test like this, correct?

"A Okay.

"Q Does the instruction on the NARK II include a warning that presumptive identification --

"MR. FUNK [the People]: Objection, hearsay.

"THE COURT: Sustained." The defense then presented a highlighted copy of the exhibit to the defendant, and asked Dowdy to read it. The People then withdrew the objection, because "Undersheriff Dowdy has been qualified as an expert, and an expert can rely on hearsay to form his opinion --," to which the court responded, "[t]hat's a good point." The defense then clarified that the instructions had a portion that described three steps one would take to perform the test. The defense asked Dowdy to read a highlighted portion of the document to the jury. Dowdy read, " '[p]resumptive identification is generally recognized within our legal system as a component of probable cause.

" 'There's no drug identification system presently in use which completely eliminates the occurrence of false positives and false negatives.

12

" 'A forensic laboratory is required to solidify and quantify and . . . identify an unknown substance.' "

Defense counsel then asked Dowdy if he felt the highlighted language was a fair statement, to which Dowdy responded, "I think it's a fair statement. Ultimately you would send the substance to a lab to get a final determination."

Defense counsel then asked Dowdy to demonstrate to the jury how the test kit would be used. Dowdy described putting the substance in a test container, then breaking three attached ampules into the container one-by-one, and agitating the mixture after each addition. He indicated the result of the demonstration of the kit's operation at trial was a "reddish-purple color," which is "not methamphetamine." In contrast, he stated, if methamphetamine had been present, it would have turned "a very dark, dark, blue purple color." He indicated, "[i]f you can see on the bottom here, the color I'm looking for is this dark, deep blue-purple color. If I don't get that deep blue-purple color, it's my belief the substance inside that vial is not methamphetamine." He indicated that he has had to explain to some agents that the purple-red color is not a positive result for methamphetamine; it needs to be "dark, dark, blue-purple."

Dowdy admitted he had never testified in front of a jury and tried to use a presumptive test to prove what the drug was. He stated generally they would send the substance to a Department of Justice lab, photograph the presumptive test, and then dispose of the presumptive test. Then, he admitted, a criminalist who can explain the science behind their testing would testify at trial. He acknowledged that the science behind the test was not part of his expertise.

### *Redirect of Dowdy*

On redirect, Dowdy testified that the warning on the NARK II kit "absolutely [did] not" change his conclusion that the substance in the case was, in fact, methamphetamine.

13

*Defense's Motion to Dismiss*

After the People rested their case, the defense made a motion for acquittal on count one under section 1118.1. The defense argued "there hasn't been sufficient evidence presented of the nature of the substance." The defense noted, "I don't believe it's common for the People to use a presumptive test to try to prove the nature of the substance. I've never seen it done before. . . .¶ . . . . [W]e don't have a chemist or an expert in the realm of conducting the test, and . . . explaining the test . . . and the chemical reaction that's going on when the ampules are broken. ¶ So I don't think the Court should rely on it." The defense also observed that "the instructions" on the test "themselves provide that warning, that this test is a probable cause test. You could use it to get a search warrant, you could use it to prove the nature of the substance at a prelim[inary hearing]. But because of the fact that false positives and false negatives cannot be excluded as a possibility, that's not proof beyond a reasonable doubt in our opinion." The defense also characterized Pfeiffer's testimony as "incredible," inconsistent, and, "not corroborated" and argued, as a result, there was a lack of proof as to who actually supplied Pfeiffer with the alleged methamphetamine. The People opposed the motion, taking the position that "we have massive evidence in this case that the substance is methamphetamine. And it was provided by the defendant."

The trial court did express some concern about the lack of a confirmatory lab test, but ultimately denied the motion, and the parties made their closing arguments. We will provide details about the closing arguments as needed in the discussion below.

*Guilty Verdict*

The jury found defendant guilty on both counts and found true the special allegation to count one.

*Defendant's Motion for a New Trial*

Defendant filed a written motion for a new trial on July 8, 2016.

14

On August 24, 2016, the trial court granted an ex parte request for funds to pay for investigative services made on the grounds that a percipient witness had come forward. On September 2, 2016, the defense filed a supplemental affidavit in support of the motion for new trial, in which Jeffrey Larsen averred that he had been in the shop when Pfeiffer came by, he did not observe any cash or drugs change hands between Pfeiffer and defendant, and if such an exchange had occurred he would have seen it.

The hearing on the motion for a new trial and sentencing was held on January 10, 2017. Four of defendant's theories as to why the motion for a new trial should have been granted are at issue here. First, defendant argued that the identity of Jeff Larsen at trial by Dowdy, and Larsen's criminal record for dealing methamphetamine was newly discovered evidence, or at least evidence that ought to have been disclosed pursuant to *Brady*. Second, he argued evidence that Pfeiffer called DA Funk and asked him to get some charges against his girlfriend dismissed about a month after trial was new evidence that went to Pfeiffer's credibility as a witness, and served as the basis for a new trial. Third, he argued that the use of the presumptive testing was improper and insufficient. Finally, he argued that in a statement made in closing argument, the People inverted the burden of proof. The trial court addressed the first three arguments, but not the fourth. We expand on the details regarding the three issues the court discussed here.

### *The Larsen and* Brady *Issue*

Defendant testified at the hearing on the motion for new trial regarding Larsen's presence. He testified he first recalled that Larsen was at the shop on the night of the incident after he heard the audio recording during the trial. He said he had not had a chance to hear the recording prior to trial. The banging on the audio reminded him that Larsen had been present. He remembered Larsen had been at the shop trying to take a hitch apart. The hitch had been difficult to remove from its receiver, resulting in pounding on it.

15

Defendant testified he was first made aware in December 2015 that criminal charges were filed against him based on the alleged events in January 2015. He stated that, during the year between the alleged transaction and when he learned about the charges, he had been on pain medications following a third back surgery. He was taking one form of medication daily for daily pain. He believed this would have impacted his ability to recall specific dates and times, and the people who came to his shop.

At the hearing, the defense noted the possible presence of Larsen came out during Dowdy's testimony at trial, and Dowdy had not mentioned Larsen when asked about who was present during the preliminary hearing. The court reviewed the transcript and clarified that at the preliminary hearing Dowdy did not say that he did not know who was present on January 28, 2015, but he indicated that Pfeiffer did not tell him who the two other people in the shop were.

The court and defense counsel had the following exchange:

"MR. KYLLO [defense counsel]: We would have not--we could not have known about Mr. Larsen--I'm saying I didn't know about Mr. Larsen as a potential witness.

"THE COURT: Well, you could have.

"MR. KYLLO: How?

"THE COURT: If you'd have played the audio tape for your client, and he then could have, presumably, gone 'Oh, that was when Jeff Larsen was there,' because of the banging, trying to get the receiver disconnected.

"Mr. KYLLO: And I will get to that, your Honor, because I think that's the People's argument, we should have known.

"THE COURT: Well, could have. You have to establish diligence in an effort to acquire evidence for trial. ¶ And I don't know that it goes to the standard you actually should have known, but the question is whether you--whether you employed reasonable diligence to obtain whatever information might have been available had you been diligent."

16

Defense counsel then explained the first copy of the audio file provided to the defense was unintelligible. Then "within a week of trial" the DA's office was able to "produce a disk" where "you could discern what was going on . . . . And that was a different quality than we had had before. ¶ And Mr. Cavasso, frankly, did not review that, didn't have time to review that before we started the trial." He also noted that on the Monday before the trial--which started on a Wednesday--the DA had "communicated . . . that he was going to dismiss the case." He elaborated that the DA had indicated on Monday morning that he was going to dismiss the case; but in the afternoon he retracted that statement and said he was going to try to get a conviction.

The defense continued, "[s]o the new evidence is Mr. Larsen. And I have supplied in my filings a declaration from him, which does support in factual innocence of my client." He argued, "the fact that we have a percipient witness who can testify that Brian Cavasso was innocent, and that that person was not readily available to us before the trial, is new evidence." The court asked, regarding Larsen's declaration, "[s]o, you contend that that comes close to establishing factual innocence because he didn't see something happen?" Defense counsel responded, "no. What I'm saying is, it's new evidence that the trier of fact didn't have that they would have had to weigh in the case. ¶ And frankly, Mr. Lars[e]n's penchant for selling drugs doesn't--it can cut both ways. The People can use that to say Brian associates with drug dealers. But, of course, we can also use that to indicate --to suggest that A.J.'s source for these drugs, if they came from that shop, was not Mr. Cavasso. ¶ But . . . the trier of fact didn't get any of that information because that witness was not named until during the trial."

In reaching its decision to not grant a new trial due to the allegedly new Larsen evidence, the court took into consideration that it is possible that multiple back surgeries and the "powerful narcotic medications over a period of time" might affect defendant's "ability to recall things," and that, in trying to piece together what happened by the time defendant was charged he was, "talking about something that was almost a year earlier."

The court indicated the Larsen issue boiled down to (1) if the Larsen evidence could have been discovered before trial in the exercise of reasonable diligence; and (2) whether the information would have had a significant impact had it been discovered. As to materiality, the court says, "I suppose I think it cuts both ways, but probably cuts more sharply, unfavorably, to Mr. Cavasso. But I don't really wish to engage in speculation about what may or may not have been different had Mr. Larsen been more fully involved at the trial." Ultimately, the court's decision came down to what the defense could have discovered if it had been reasonably diligent. It said, "I just do not see how I can conclude that this is material evidence that" could not "have been discovered in the exercise of reasonable diligence." The court concluded, "I just do not see this as being newly discovered material evidence that could not have been discovered in the exercise of reasonable diligence. ¶ So I'm denying the motion for a new a trial."

### *Pfeiffer's Request Regarding His Girlfriend's Case*

Per a stipulation at the hearing on the motion to dismiss, about a month or two after the jury trial, Pfeiffer called DA Funk and asked him to dismiss two cases against his girlfriend that were pending at the time of defendant's trial, and Pfeiffer said something that indicated he expected that as a quid pro quo for his testimony. The defense argued this "cuts against the People's argument during trial that [Pfeiffer] had no reason to lie. . . . It appears that he was doing that to curry favor for his girlfriend, who is the mother of his child, I believe." In responding, the DA stated, "certainly Mr. Pfeiffer calling me up is some new evidence that he had an expectation, even though I didn't do anything to create an expectation in him. I made it clear to him that there were no, quid pro quos, and that came out very thoroughly at trial."

In denying the request for a new trial on these grounds, the court stated, "it kind of smells smarmy of Mr. Pfeiffer, but I do not see that as evidence newly discovered that would mean, the issue was--he was cross examined about that issue. ¶ The evidence that

18

I've heard is that there was no quid pro quo. And he may be smarmy for trying to get some after the fact, but I don't think the fact that he weaseled around and tried to convince the District Attorney . . . to do something after the fact to help his girlfriend out is a basis to conclude that there should be a new trial."

### *Drug Testing Issue*

In his motion for a new trial, the defendant again raised the issue that the alleged methamphetamine was not tested by a crime lab. He attached articles to the motion regarding the unreliability of using presumptive tests to make convictions.

In denying the request for a new trial, the trial court indicated it did not see the issue regarding the form of testing used as evidence at trial as providing a basis for a new trial, correctly noting the lack of follow-up testing by a lab had come up at trial. The court stated, "I don't regard the issue of presumptive testing as providing a basis for a new trial. It may be a basis for an appeal, as somehow legally deficient or not supportive of a criminal conviction, but that's not the basis for a new trial motion."

### *Sentencing*

The trial court sentenced defendant to three years of formal probation with 180 days of electronic monitoring. It also imposed various fines.

DISCUSSION

I

*Substantial Evidence Supported the Finding That the Substance Defendant Provided Pfeiffer Was Methamphetamine*

Defendant argues that because false positives from NARK II test kits cannot be excluded, and the alleged methamphetamine was never submitted to a crime lab for further conclusive testing, there was insufficient evidence admitted at trial to support the jury's finding that defendant was guilty of selling methamphetamine as contemplated by Health and Safety Code section 11379, subdivision (a).

19

*A. Standard of Review*

This court's role in reviewing a challenge to the sufficiency of evidence is limited. (*People v. Smith* (2005) 37 Cal.4th 733, 738.) "To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) In assessing the evidence, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) This is so, because "it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends." (*Ibid.*) As such, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*).) And, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [956 P.2d 374].)" (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)

*B. Sufficient Evidence Supports the Jury's Finding That the Substance Was Methamphetamine*

The evidence presented at trial was sufficient to support the jury's finding that the substance defendant sold Pfeiffer was methamphetamine. Defendant suggests that because the NARK II test was not error proof, and false-positives are an acknowledged

possibility, there was insufficient evidence to support a finding that the substance defendant sold Pfeiffer was methamphetamine. This argument ignores the totality of the evidence presented to the jury.

"[C]hemical analysis is not always required to establish the identity of a controlled substance. The essential elements of possession of a controlled substance ' "may be established circumstantially." ' (See *People v. Palaschak* (1995) 9 Cal.4th 1236, 1242 [].) Chemical test results are routinely introduced at trial to establish the illegal nature of a controlled substance, but they are not required. '[T]he nature of a substance, like any other fact in a criminal case, may be proved by circumstantial evidence. [Citations.] It may be proved, for example, by evidence that the substance was a part of a larger quantity which was chemically analyzed [citations], by the expert opinion of the arresting officer [citation], and by the conduct of the defendant indicating consciousness of guilt.' (*People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369 [228 Cal. Rptr. 96]; see also [*People v. ]Davis*[ (2013)] 57 Cal.4th [353,] 357 [citing cases where expert testimony on methylenedioxymethamphetamine's (MDMA) 'chemical composition' or its 'effects on the user' were used to establish possession of a controlled substance]; *People v. Marinos* (1968) 260 Cal.App.2d 735, 738 [67 Cal. Rptr. 452] [affirming marijuana possession conviction premised on the arresting officer's testimony].)" (*People v. Mooring* (2017) 15 Cal.App.5th 928, 943-944.)

Here, sufficient evidence supports the jury's verdict. Undersheriff Dowdy had vast experience with the test in question and with the investigation of narcotics in general. He had sent substances he tested positive for methamphetamine using a NARK II kit to a crime lab more than 50 times, and had never received results back from the lab indicating the NARK II results had been a false positive. The packaging for the substance was consistent with packaging used to sell methamphetamine. Pfeiffer purchased what he believed was methamphetamine from the defendant on a prior occasion earlier that same day, and the controlled buy was completed, he consumed it and

21

got what he expected: a high from it. The jury could have taken these facts and reasonably concluded that the substance sold to Pfeiffer was methamphetamine.

Defendant tries to buttress his argument by stating the admission of the NARK II test results was somehow illegal or violated his due process rights because the results are unreliable. These arguments are non-starters. With, respect to his argument that the admission of the test was in violation of state law, he relies heavily on his position that consideration of the test violated the *Kelly-Frye* test, which is articulated in *People v. Kelly* (1976) 17 Cal.3d 24. But the *Kelly-Frye* test applies to "novel method[s] of proof" that are "new technique[s]." (*Kelly*, at p. 30.) Here, though it may not have be common for prosecutors to offer presumptive testing without obtaining further lab results, the NARK II test itself was not a novel testing method or a new technique, leaving defendant to try to counter the results of a test where information on its degree of reliability was unavailable. In fact, to the extent the presumptive test had its weaknesses and flaws, defense counsel was able to highlight those possible weaknesses by having Dowdy read instructional warnings to the jury, and to elicit testimony regarding Dowdy's own lack of understanding of the chemical processes in the test and how he normally backs up presumptive results by sending them to a crime lab. For similar reasons, defendant's argument that allowing Dowdy to testify about the test results rendered his trial unfair to the extent that it gave rise to a due process violation is without merit. Defendant had ample opportunity to challenge the strength of the results.

II

*Dowdy's Testimony About the Nark II Test Results Was Not Inadmissible Hearsay*

Defendant argues that Dowdy's statement that the dark blue reaction to the NARK II test indicated the presence of methamphetamine was inadmissible hearsay, as contemplated by our Supreme Court in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Defendant's reasoning is as follows: (1) *Sanchez* bars experts from reciting

22

case-specific and testimonial out-of-court statements at trial; (2) Undersheriff Dowdy recited information provided to him in an out-of-court statement made by unidentified persons who put the information on the NARK II testing kit when he stated the chemicals in the test turning dark blue indicated the presence of methamphetamine; and (3) his "statements about the NARK II kit, as true and accurate to support his expert opinion that the evidence was methamphetamine" were "case-specific out-of-court statements."

We disagree. The box instructions and Dowdy's testimony about his experience regarding what a dark blue reaction indicates were not case-specific or testimonial hearsay.

California law defines hearsay as "a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code., § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (*Id.*, subd. (b).)

When testifying as to an opinion, an expert may "state on direct examination the reasons for his opinion and the matter (including . . . his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code., § 802.) As such, "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Sanchez*, *supra*, 63 Cal.4th at p. 676.) In contrast, "an expert has traditionally been precluded from relating case-specific facts about which the expert has no independent knowledge." (*Ibid.*) Thus, "[a]t common law, the treatment of an expert's testimony as to general background information and case-specific hearsay differed significantly." (*Id.* at p. 678.) "If no competent evidence of a case-specific fact has been, or will be, admitted, the expert cannot be asked to assume it," in forming his or her opinion. (*Id.* at p. 677.)

In *Sanchez* our Supreme Court considered the degree to which the United States Supreme Court's ruling in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d

177], "limits an expert witness from relating *case-specific* hearsay content in explaining the basis for his opinion." (*Sanchez*, 63 Cal.4th at p. 670, italics added.) In so doing, the Court emphasized that, "[o]ur decision does not call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field. Indeed, an expert's background knowledge and experience is what distinguishes him from a lay witness, and, as noted, testimony relating such background information has never been subject to exclusion as hearsay, even though offered for its truth. Thus, our decision does not affect the traditional latitude granted to experts to describe background information and knowledge in the area of his expertise. *Our conclusion restores the traditional distinction between an expert's testimony regarding background information and case-specific facts*." (*Id.* at p. 685, italics added.)

Thus, the first step we take in deciding whether *Sanchez* required the trial court to exclude the testimony at issue--a reaction that turns the NARK II test liquid dark blue indicates the presence of methamphetamine--is to determine if that information is background information or case-specific information. Both *Sanchez* and subsequent decisions applying *Sanchez* make clear that this information was background information and not case-specific information. For instance, in *Sanchez*, the Court indicated, "[t]hat an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Sanchez*, *supra*, 63 Cal.4th at p. 677.)

Similarly, in *People v. Veamatahau* (2020) 9 Cal.5th 16, 21-22, the Court considered "whether an expert related impermissible case-specific hearsay. The expert told the jury that he identified the controlled substance the defendant was charged with

24

possessing by comparing the visual characteristics of the pills seized against a database containing descriptions of pharmaceuticals.  The expert testified that this procedure was 'the generally accepted method of testing for this kind of substance in the scientific community,' and his search on the database led him to the conclusion that the pills contained alprazolam, the generic name for Xanax.  The expert also revealed the contents of the database, stating that if one looks up a particular imprint number, '[the database is] going to tell you that . . . [a pill bearing such imprint] contains alprazolam, 2 milligrams.' "  The Court agreed with the Court of Appeal's conclusion that, " 'testimony about the database, while hearsay, was not case specific, but the type of general background information which has always been admissible when related by an expert.' " (*Id.* at p. 22.)

Here, Dowdy's testimony, which was based both on the instructions to the NARK II test and his own experience of sending 50 or more dark blue results to a lab for further testing and receiving confirmation of the presence of methamphetamine every time, was background knowledge he possessed as an expert, much like the import of information taken from a database in *Veamatahau* and the significance of a diamond tattoo in *Sanchez* were identified as general background information.  In contrast, the fact that the result of the specific test Dowdy made of the substance Pfeiffer gave him was a dark blue liquid is like the case-specific facts that a certain individual had a diamond tattoo in *Sanchez* and that a pill has certain imprinted information in *Veamatahau*.  But here, because Dowdy actually did observe the test results, his stating them was not hearsay.

Finally, Dowdy's conclusion that the results of the test--along with other facts correctly admitted at trial--caused him to form an opinion that the substance was methamphetamine was like the conclusion from the example in *Sanchez* that a person with a diamond tattoo was in a gang and the expert's conclusions in *Veamatahau* that a pill with certain markings contained Xanax.  Because the import of a dark blue reaction was not a case-specific fact, it was proper for Dowdy to testify about it at trial, and we

25

need not engage in an analysis that applies the *Sanchez* rule as if it was a case-specific fact.

III

*The District Attorney Did Not Have a Conflict of Interest*

Prior to being elected as the District Attorney of Modoc County, Jordan Funk, who represented the People at trial, worked as a defense counsel. As a defense counsel, he represented Pfeiffer in a case where Pfeiffer pleaded guilty to possession of methamphetamine with intent to sell and second degree burglary. The court sentenced Pfeiffer to a year in county jail and placed him on probation for those crimes. DA Funk's prior history with Pfeiffer was made known during the People's direct examination of Pfeiffer. Defense counsel made no objection to DA Funk acting as the prosecutor at trial due to his prior representation of Pfeiffer. Now, defendant argues DA Funk's prior relationship with Pfeiffer created a conflict of interest that denied defendant his due process rights.

As a preliminary matter, "[a] criminal defendant, like any other party to an action, may not sit on his or her rights." (*In re Seaton* (2004) 34 Cal.4th 193, 199-200.) Thus, "a defendant generally may not raise on appeal a claim not raised at trial." (*Id.* at p. 200.) Because defendant did not raise the issue of a possible conflict resulting from DA Funk prosecuting this case at trial, he has forfeited his ability to raise that claim here.

However, in an effort to resurrect the issue, defendant now claims that his trial counsel committed ineffective assistance when he failed to object to DA Funk's role in the trial. We find that DA Funk's prior relationship with Pfeiffer did not create a conflict that would have warranted his removal and, as such, that trial defense counsel was not ineffective for failing to raise the issue.

Section 1424, subdivision (a), establishes both a procedure and standard for defendants to use if they wish to ask the trial court to prevent a district attorney from

26

acting as prosecutor in a criminal trial. If a party wants the trial court to disqualify a district attorney from prosecuting a case, he must file a noticed motion. (§ 1424, subd. (a).) The district attorney and Attorney General would then be afforded the opportunity to respond to the motion. (*Ibid.*) After reviewing the submissions of the parties, the trial court would then have the authority to determine if an evidentiary hearing was required. (*Ibid.*) Finally, after the court considers all the evidence and arguments, "[t]he motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (*Ibid.*)

Our Supreme Court has interpreted section 1424 as "establishing a two-part test: (i) is there a conflict of interest?; and (ii) is the conflict so severe as to disqualify the district attorney from acting?" (*People v. Eubanks* (1996) 14 Cal.4th 580, 594, citing *People v. Conner* (1983) 34 Cal.3d 141, 148.)

Here, defendant would not have been able to satisfy the first part of this two-part test had he brought a motion to recuse DA Funk. "A 'conflict,' within the meaning of section 1424, exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner." (*People v. Conner, supra,* 34 Cal.3d at p. 148.) There is simply no evidence that DA Funk's prior representation of Pfeiffer somehow influenced his ability to fairly exercise his discretion with respect to the defendant.

The cases defendant cites to suggest there was a conflict are inapposite. In *Love v. Superior Court* (1980) 111 Cal.App.3d 367, 370, a conflict was found when a deputy district attorney within the "very section" responsible for prosecuting the defendant had previously served as legal research assistant working on the defense in the case against the defendant. The Court observed that as a legal research assistant, the deputy district attorney, "was privy to confidential information vital to the defense." (*Ibid.*) In *People v. Vasquez* (2006) 39 Cal.4th 47, 52, 55, 58 the Court found that the "family relationship

between defendant Vasquez and two employees of the Los Angeles County District Attorney (LACDA)," one of whom had worked for the office for 13 years, created a conflict of interest, but that the trial court's denial of a section 1424 motion did not give rise to a constitutional violation. The Court reasoned the conflict existed because even though the deputy district attorney assigned to the case, "had no personal interest in the case, . . . two other employees of the LACDA, Vasquez's mother and stepfather, did." (*Id.* at p. 57.) The Court believed that personal interest, could lead the deputy district attorney to be concerned that "acceding to a defense request would be perceived by the victim's family as favoritism," and, consequently, influence his decision not to accept a defense proposal. (*Id.* at pp. 57-58.)

In *Melcher v. Superior Court* (2017) 10 Cal.App.5th 160, 163, 166, 170, this court observed "[t]here is no dispute the district attorney's marriage to the victim created a conflict of interest in this case," but that "we cannot say petitioner has overcome [the] presumption" that the district attorney properly discharged its duty, "or that the trial court abused its discretion when it refused to recuse the district attorney's office in this matter" after various safeguards, including an ethical wall that prevented the district attorney from influencing the case and a waiver by the district attorney of any rights to participate in the case.

In all of these scenarios, the potential conflict at issue was the district attorney's, its employee's, or its close family member's direct relationship with the defendant. Here, DA Funk's prior representation of Pfeiffer had no impact on his relationship with, how he would feel about, or how he would choose to treat the defendant. As to defendant's argument that DA Funk's prior relationship with Pfeiffer caused unfairness because it somehow caused DA Funk to become a witness in the case and vouch for Pfeiffer's credibility in ways he otherwise would have been unable to, as we discuss in the section VI.C. below, we find no such unfairness arose.

28

## IV

### *The People Did Not Commit a Brady Error*

Defendant argues that the prosecution withheld evidence that Jeff Larsen, a known drug dealer, was present on January 28, 2015, when Pfeiffer visited defendant's shop. Additionally, defendant argues the prosecution withheld evidence that six-months before the incident, Dowdy found 126 grams of methamphetamine at Larsen's residence, resulting in a pending case against him. Defendant says the evidence is exculpatory because it could have been used to suggest someone besides defendant sold the drugs to Pfeiffer, and it could have been used to impeach the People's witnesses. Defendant argues, pursuant to *Brady, supra,* 373 U.S. 83, he was denied a right to due process and a fair trial because the prosecution withheld evidence about the identity of and criminal history of Larsen. Additionally, defendant argues that if we conclude there was no *Brady* violation due to defense counsel's lack of diligence, then he was denied his right to effective assistance of counsel. We find that defendant has not proven a *Brady* violation, and address the ineffective assistance of counsel claim in section VI.D. below with the remaining ineffective assistance of counsel claims raised by the defendant.

Under *Brady*, a criminal defendant has a due process right to pretrial discovery of information favorable to his defense. (*Brady*, *supra*, 373 U.S. at p. 87.) Our Supreme Court has described this obligation as follows: "A prosecutor in a criminal case must disclose to the defense certain evidence that is favorable to the accused. ([*Brady, supra,* 373 U.S. 83].) This duty sometimes requires disclosure of evidence that will impeach a law enforcement officer's testimony. (*Giglio v. United States* (1972) 405 U.S. 150, 154–155 [31 L. Ed. 2d 104][].) Such disclosure may be required even if the prosecutor is not personally aware that the evidence exists. (*Kyles v. Whitley* (1995) 514 U.S. 419, 437 [131 L. Ed. 2d 490][].) Because the duty to disclose may sweep more broadly than the prosecutor's personal knowledge, the duty carries with it an obligation to 'learn of any

29

favorable evidence known to the others acting on the government's behalf in the case, including the police.' (*Ibid.*)" (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 36.)

"There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282 [144 L.Ed.3d 286] (*Strickler*).) " 'Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt or innocence." [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction "more likely" [citation], or that using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" [citation]. A defendant instead "must show a 'reasonable probability of a different result.' " ' ([*People v. *]*Salazar* [(2005)] 35 Cal.4th [1031,] 1043.) 'The requisite "reasonable probability" is a probability sufficient to "undermine[] confidence in the outcome" on the part of the reviewing court.' (*In re Sassounian* (1995) 9 Cal.4th 535, 544 [].)" (*People v. Jimenez* (2019) 32 Cal.App.5th 409, 418 (*Jimenez*).) When information is available to the defendant, and the only reason he does not obtain and present the information is his own lack of reasonable diligence, it is not suppressed. (See *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 715-716.)

"On appeal, the defendant bears the burden to establish the components of a *Brady* violation. (*Strickler*, *supra*, 527 U.S. at pp. 289, 291.) We independently review whether such a violation occurred but give 'great weight to any trial court findings of fact that are supported by substantial evidence.' (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 [].)" (*Jimenez*, *supra*, 32 Cal.App.5th at p. 418.)

Most obviously, defendant's *Brady* claim fails because the evidence suggests that to the extent facts about Larsen remained unknown to the defense, those facts were made known at trial. First, Dowdy identified Jeff Larsen at trial. Then, the prosecutor attempted to elicit more information on him, and the defense objected, effectively cutting off all further questioning about Larsen's potential involvement at the crime scene. When undisclosed information becomes known at trial, a failure to make a proper objection, request appropriate sanctions, or seek a continuance is "is fatal to [defendant's *Brady*] contentions on appeal." (*People v. Morrison* (2004) 34 Cal.4th 698, 714.)

Even without the mention of Larsen at trial, defendant would not be able to meet his burden to show that the information about Larsen was suppressed. Though defense counsel indicated at the motion for a new trial that the first copy of the audio he received was unintelligible, it was good enough that he could discern that Pfeiffer is "a fairly foulmouthed guy from the sounds of this audio" by the time of the preliminary hearing two months before trial. Then, though there had been discussions about possibly dismissing the case earlier in the day, two days before trial defense counsel was provided an audio file where "you could discern what was going on . . . . And that was a different quality than [what] we had had before." Even if this only provided counsel a short amount of time to hear the audio file and share it with his client, it still afforded him some opportunity to listen to it, to ask his client who the Jeff and Marshall mentioned in the audio were and about the loud banging heard, and/or to seek a continuance from the court if he felt the need to investigate further.

Additionally, defendant cannot show that there is a reasonable probability of a different result if this information had been revealed. First, the fact that a person known for dealing in methamphetamine was present at the shop during the sale lends credence to the notion that defendant had access to methamphetamine the night of the sale and associated with known dealers.

31

Pfeiffer testified that when he got to the shop, defendant met him at the door. He testified the transaction took place in front of a flatbed truck and was hush-hush, the other two people in the shop were squatted on the ground behind the truck, and he did not believe the other two men could see what Pfeiffer and defendant were doing. And the audio recording supports this version of events. The earlier dialogue on the audio file is harder to understand than the later dialogue. The earlier portion of the interaction at the shop contains the snippets of "[n]ow we're talkin,' this is my forte," and, "[w]hattya want for it?" After that conversation was completed, someone introduced Pfeiffer to "Jeff" and "Marshall," and there was a more casual conversation about what the two men were doing at the shop. This suggests Pfeiffer was not introduced to the other two men in the shop until after the methamphetamine sale occurred, and the other two men were, in fact, working on something attached to the low back end of a vehicle at that time. Additionally, the fact that defendant's recollection was refreshed by the banging on the audio hints that whatever the other two men were doing was loud, making it less likely they heard Pfeiffer enter the shop or the substance of a hush-hush conversation between defendant and Pfeiffer on the other side of the truck. In short, the information about Larsen leaned more towards suggesting defendant's guilt than his innocence: his presence demonstrated that defendant was in contact with a known methamphetamine dealer on the night of the sale and Pfeiffer's testimony, which was corroborated by the audio, readily explained why Larsen could have missed viewing the sale.

V

*The Prosecutor Did Not Commit Prejudicial Misconduct*

In this appeal, defendant alleges eight separate instances of prosecutorial misconduct during trial. However, he only objected to one of the alleged instances during the trial, and addressed one other of the alleged instances in his motion for a new trial. As he admits, he did not raise any form of objection to the remaining six alleged

instances of misconduct.  We find defendant has forfeited his claims of prosecutorial misconduct in all instances where he failed to object during trial.  We find the trial court properly overruled the objection and there was no misconduct in the one instance where the defense did object.  We also examine the one alleged instance of misconduct defendant raised in his motion for new trial and find it lacks merit.

"[T]o preserve a claim of prosecutorial misconduct for appeal, ' " 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.' " [Citation.]  The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' (*People v. Powell* (2018) 6 Cal.5th 136, 171 [].)  ' " 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.]  In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.]' " ' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 942-943.)

With respect our evaluation of a prosecutor's arguments to a jury, "[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)  In so doing, a prosecutor "may draw from matters that are not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature." (*People v. Ghobrial* (2018) 5 Cal.5th 250, 289, internal quotations marks omitted.)  " 'When attacking the prosecutor's remarks to the jury, the defendant must show that, "[i]n the context of the whole argument and the instructions" [citation], there was "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' (*People v. Centeno* (2014) 60 Cal.4th 659, 667 [].)" (*People v. Dalton* (2019) 7 Cal.5th 166, 251-252.)  " ' "When [a prosecutorial misconduct] claim

33

focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable." [Citation.]' (*People v. Cox* (2003) 30 Cal.4th 916, 960 [].)" (*People v. Tully* (2012) 54 Cal.4th 952, 1043.)

Given the two instances of alleged misconduct that we consider here happened during closing arguments, it is useful to examine some of the instructions the trial court provided to the jury.

Notably, at the start of trial, before evidence was presented to the jury, the court instructed the jury, "[y]ou[r] verdict must be based only on the evidence presented during the trial, in this court, and on the law as I provide it to you." Later, after the close of evidence and before the attorneys presented their closing arguments, the court instructed, "I will now instruct you on the law that applies to this case." "You must follow the law as I explain it to you, even if you disagree with it." "If you believe the attorneys' comments on the law conflict with my instructions, you must follow my instructions." "A Defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a Defendant guilty beyond a reasonable doubt. ¶ Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. ¶ Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." "Unless the evidence proves the Defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

A. *The Statement the Defense Objected to Was Not an Instance of Misconduct*

In their closing argument the People stated, "[w]hen [Pfeiffer] came into court yesterday, we had, and we continue to have, no leverage on him whatsoever. We have no way to make him tell the truth. Why did he?" The defense objected, arguing that this

34

misstated the evidence, and the court overruled the objection. Defendant now argues that, though there was testimony from Dowdy that they had no leverage over Pfeiffer because there were no pending cases against him, the prosecutor's statements ignored that if Pfeiffer had lied on the stand or changed his story the prosecutor would have the recourse of charging Pfeiffer with perjury. As such, defendant reasons, in claiming there was "no leverage" the prosecutor was improperly vouching for Pfeiffer and injecting facts outside the record.

A " 'prosecutor is entitled to comment on the credibility of witnesses based on the evidence adduced at trial.' (*People v. Thomas* (1992) 2 Cal.4th 489, 529 [].)" (*People v. Wilson* (2005) 36 Cal.4th 309, 338.) Here, Dowdy testified that they had no leverage over Pfeiffer, and Pfeiffer indicated he was getting nothing in return for his testimony. The prosecutor's statements during closing arguments were a reasonable comment on the evidence presented. Additionally, to the extent this statement did not take into account that Pfeiffer may have suffered consequences for perjuring himself or changing his story to suggest he lied about buying methamphetamine from defendant, a reasonable jury would understand that (a) Pfeiffer could face consequences for changing his story to suggest he misled the police in a criminal investigation, and (b) that in asserting they lacked leverage the People and Dowdy were referring to the ability to grant Pfeiffer some sort of leniency in a pending case. After all, the "leverage" about which defendant complains is no different than the "leverage" the prosecution has regarding any witness's testimony at trial. There was no misconduct in this instance.

*B. The Instance Raised in the Motion for New Trial*

During his rebuttal argument, the prosecutor misspoke and said, "[i]s that Defendant innocent? ¶ Well, he's presumed guilty, even after all of that evidence is presented to the jury until you go . . . ." A few moments earlier, the prosecutor had said, "everything we do is governed by the presumption of innocence," and he made additional

35

references to the "presumption of innocence." Later, the prosecutor referred to how the jury would have to "presume the Defendant is not guilty; it's really just an assumption of innocence until the contrary is proven." It is apparent that the prosecutor's reference to defendant being "presumed guilty" was no more than a slip of the tongue. In light of everything else the prosecutor said during closing argument, and the court's instructions to the jury, it is extremely unlikely this single incidence of misspeaking caused the jury to decide that the defendant was presumed guilty until proven innocent. This was not misconduct. This was an understandable human error.

VI

*Defendant's Trial Counsel Did Not Provide Ineffective Assistance*

In an effort to overcome the fact that many of the arguments he raises here were forfeited by his failure to raise appropriate objections at trial, the defendant argues he received ineffective assistance because his trial counsel (1) did not object to DA Funk's alleged conflict of interest; (2) did not object to six alleged instances of prosecutor misconduct; (3) did not discover *Brady* material--i.e., that Jeff Larsen was present during the alleged sale; and (4) did not cite *Sanchez* in a motion for new trial. Defendant has failed to prove his counsel was ineffective based on the record.

*A. Applicable Standards*

"To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." (*People v. Kelly* (1992) 1 Cal.4th 495, 519-520.) " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Bolin, supra,* 18 Cal.4th at p. 333.)

We presume counsel's conduct fell within the "wide range of reasonable professional assistance." (*Maury, supra,* 30 Cal.4th at p. 389.) Our review is limited to

36

the record on appeal and we must reject a claim of ineffective assistance "if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation." (*People v. Burgener* (2003) 29 Cal.4th 833, 880.) If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674].) " 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.)

If we consider the question of whether counsel's actions caused prejudice to the defendant, that "prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)" (*People v. Maury*, *supra*, 30 Cal.4th at p. 389.)

### B. *No Failure for Failing to Allege DA Funk Had A Conflict of Interest*

Trial defense counsel did not err in failing to object claim DA Funk had a conflict due to his prior representation of Pfeiffer. As we found in section III, above, Funk had no conflict of interest. As such, defense counsel was not ineffective for failing to claim otherwise.

### C. *No Failure for Not Claiming Prosecutorial Misconduct*

Defendant alleges that there were seven instances in which trial defense counsel ought to have raised an objection to DA Funk's conduct, but did not. Additionally, defendant argues that the failure to make these objections rendered his trial counsel's

representation prejudicially ineffective.  Defendant cannot show ineffective assistance on these grounds either.

### 1. When DA Funk Misspoke

The first instance where defendant argues his trial counsel ought to have objected on misconduct grounds but did not is when the prosecutor stated, "he is presumed guilty" during rebuttal argument.  As we discussed in section V.A., this statement was not tantamount to harmful misconduct, but a mistake rendered toothless in context.  Trial counsel's failure to object was equally harmless and did not rise to ineffective assistance.

### 2. Alleged Vouching for Police Officers

During closing arguments, the People argued, "I sincerely hope that no one takes the position" to not consider Pfeiffer's testimony, "corroborated because [Dowdy and Main are] peace officer[s] or that somehow we should--we should not give them credibility.  ¶  Peace officers have to be evaluated by the same standards as every other potential witness.  But these are good men who are trying to do their job."  Defendant argues that is referring to the peace officers as "good men who are trying to do their job" the prosecutor was improperly vouching for them and bolstering them using evidence outside the record.  Defendant argues that trial defense counsel's failure to object to this contributed to rendering counsel's representation ineffective.

Defendant cannot show there was no tactical reason for not objecting to this statement.  As a preliminary matter, taken in context with the jury instructions and the remaining substance of this portion of the People's argument, this statement was unlikely to have an impact on the jury.  It was part of the prosecutor's efforts to prevent the jury from acting in a manner that was biased against the peace officers due to their job titles.  Additionally, trial defense counsel might have avoided objecting because he did not want to come across as antagonistic to peace officers.  Defendant cannot meet his burden as to this point.

38

### 3. Putting the Prestige of the DA's Office Behind the Case

During cross examination of Dowdy, the defense asked him, "[w]ould you agree that you're relying on the credibility of A.J. Pfeiffer to proceed in this case?" The prosecutor objected to the question, and as part of his efforts to explain the nature of his objection explained, "the question . . . implies that Mr. Dowdy is bringing this case. Undersheriff Dowdy is not bringing this case[;] he's just a witness. ¶ This case is brought by the People of the State of California in Modoc County, filed by the District Attorney, after a preliminary examination presided over by this Court. So the question is irrelevant." Defendant argues that in indicating the case was brought by the Modoc County District Attorney, the prosecutor improperly placed the prestige of his office behind the case. Additionally, defendant argues that his trial counsel's failure to object rendered his representation ineffective.

To begin with, the prosecutor's statement was a fair characterization of the reason for his objection: Dowdy was not the one who had the power to decide to bring the case; the Modoc County District Attorney was. Second, any objection to the prosecutor's statement would likely have engendered even further discussion and argument surrounding why the case was brought and the various hurdles the case had to cross to be considered worthy of pursuing to trial. It is certainly possible defense counsel decided, as a tactical matter, that to quibble over the prosecutor's statement would have done more harm than good to his client's chances of acquittal.

### 4. Two Alleged Instances of Violating the Witness Advocate Rule

During his redirect of Pfeiffer, the prosecutor inquired about meetings the prosecutor, Pfeiffer, and Dowdy had in the lead up to the trial. Similarly, during his examination of Undersheriff Dowdy, the prosecutor asked him about meetings the two of them had with Pfeiffer prior to trial. Defense counsel at trial did not object to this line of questioning. Defendant argues that in both cases, where the prosecutor began by asking

39

the witnesses to verify they had all met, the prosecutor was vouching for the witnesses using facts not in evidence and violating the advocate-witness rule, thereby committing prosecutorial misconduct. Defendant further argues that to the extent the defense forfeited the ability to challenge the prosecutor's actions on appeal by failing to object at trial, defense counsel was ineffective.

This argument borders on the frivolous; every trial lawyer worthy of the name meets with his or her witnesses prior to trial to go over their expected testimony and to urge them to tell the truth. That's what happened here. The prosecutor was not vouching for the witnesses, he was only asking the witness to put into evidence the fact that they had met and talked about the witnesses' testimony, before the defendant's counsel had the opportunity to suggest on further examination there was something sinister about those meetings.

As currently stated, Rule 3.7(a) of the State Bar of California's Rules of Professional conduct prohibit an attorney from acting "as an advocate in a trial in which the lawyer is likely to be a witness" absent certain circumstances we need not consider here. Here, the prosecutor did not act as a witness in questioning Dowdy and Pfeiffer. Instead, he elicited testimony from them about the meetings where he was present, eliminating any possible need for him to testify about the meetings. In so doing, he was not assuming facts not in evidence. Rather he was getting certain facts into evidence through the testimony of the witnesses. Furthermore, the fact that Pfeiffer had met with Dowdy and the prosecutor was elicited from Pfeiffer during the defense's cross examination of him, which occurred before the People asked the questions defendant now objects to. There was no misconduct and defense counsel was not ineffective for failing to object to this line of questioning on the grounds that the prosecutor was acting as a witness.

40

*5. Two Additional Statements at Issue Made During Closing Arguments*

Defendant raises two more instances in which he alleges the prosecutor committed misconduct and defense counsel raised no objection. In both instances, the gist of defendant's argument is that the statements were based on facts not in evidence. Both statements at issue were made during the People's rebuttal arguments in closing.

In the first instance, the People indicated the defense has suggested during its argument that the People's position had been that the jury should "believe every snitch." The People countered that the defense's assessment of the People's position about snitches was not accurate. In elaborating on this point, the People asked the jury, when evaluating Pfeiffer's testimony, to consider what made Pfeiffer different from many other witnesses who "snitch." The People then observed that it is common in criminal cases to promise witnesses immunity, which they did not offer Pfeiffer. This incident was not misconduct. It was a fair statement that culled from (1) something the jury likely already understood--persons facing criminal charges sometimes are given immunity in exchange for testifying against other criminal defendants, and (2) Dowdy's testimony that there were no pending cases against Pfeiffer and therefore the prosecution had no leverage over Mr. Pfeiffer.

In the second instance, the prosecutor responded to what he called, "a legitimate argument," by the defense, "that you should consider; the fact that I've represented Mr. Pfeiffer." He states, "[n]ow folks, there is no evidence before you that Mr. Pfeiffer and I hang out together, and [that] I've been going to Soledad to visit him; that I've been calling him on the phone. But I think it's legitimate for you to consider the fact that I represented him previously." He then goes on to address the evidence that was discussed in the defense's closing about Pfeiffer's criminal past, which included language that after Pfeiffer was released from prison for a prior offense, "it didn't take him long from when he must have got out to when he starts his new crime spree." The prosecutor stated,

41

"[l]ook, the guy's a criminal, okay? But there's a mischaracterization of the evidence. The idea that somehow he's the Son of Sam, he's Satan personified, we can't trust him. He's a 29-year-old guy who's trying to change." This too was a fair characterization of the testimony at trial and response to the defense's arguments. It countered the hyperbolic language of describing Pfeiffer's criminal conduct as a "crime spree," fairly advised the jury to consider DA Funk's prior representation of Pfeiffer, and correctly observed there was no evidence that the DA Funk and Pfeiffer subsequently developed a relationship where they spent a great deal of time together. This was not misconduct, and there was no error in failing to object.

### D. Failure to Identify Brady Evidence

Defendant argues his trial counsel was ineffective because he failed to discover information about Larsen's presence during the transaction. As a preliminary matter, while trial defense counsel did indicate at the motion for new trial that he did not listen to a clearer copy of the audio recording in time to discuss it with his client before trial, it is unclear that he actually had no idea about who else might have been present at the alleged sale and never explored who those people might be with his client earlier in the case. His questioning during the preliminary hearing indicated that while much of the recording had been muffled, it had been clear enough that he could surmise that Pfeiffer was a "fairly foulmouthed guy." It is possible that defense counsel was able to discern another party was present and that he elected not to pursue that avenue because it would have led to the discovery that, on the evening of the transaction, defendant was associating with someone else who could have served as a methamphetamine supplier.

For similar reason, and as discussed in section IV above, we do not believe defendant can affirmatively show prejudice due to a lack of information about Larsen's presence during the transaction.

*E.  Failure to Cite* Sanchez *in the Motion for New Trial*

Defendant argues his trial counsel was ineffective because he did not cite *Sanchez* in the motion for new trial to support the argument that Dowdy's testimony about the NARK II kit results ought to have been excluded at trial.  Because we find *Sanchez* would not have applied to exclude the testimony at issue, we also find this argument lacks merit.

VII

*The Trial Court Did Not Err in Denying Defendant's Motion for a New Trial*

Defendant argues the trial court erred in denying his request for a new trial on four grounds.  First, he argues the trial court abused its discretion when it refused to grant a new hearing on the basis of the discovery of new evidence that, after the trial, Pfeiffer called DA Funk and asked him to dismiss two charges then pending against his girlfriend.  Second, he argues the trial court abused its discretion when it did not grant a new trial due to the People's alleged *Brady* violation when it did not disclose to the defense information about Larsen.  Third, he argues a new trial ought to have been granted because there was insufficient evidence that the substance exchanged was methamphetamine, because the drugs were never tested by a crime laboratory.  Finally, defendant argues he ought to have been granted a new trial because the prosecutor "argued that the defendant is presumed guilty" in closing arguments.  Given our conclusions in sections I, IV, and V, above, we find defendant does not succeed in the latter three arguments.  Additionally, as explained here, we find he cannot show the trial court abused its discretion when it did not grant the motion for a new trial on the basis of the evidence regarding Pfeiffer's post-trial call to DA Funk.

Section 1181, subparagraph 8, permits a court to "grant a new trial" after "a verdict" or "a finding" has been "made against the defendant," and "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable

43

diligence, have discovered and produced at the trial." In general, "a motion for a new trial is addressed to the sound discretion of the trial court, and its action will not be disturbed except for a clear abuse of discretion." (*People v. McGarry* (1954) 42 Cal.2d 429, 432-433.) More specifically, newly discovered evidence, "which would merely impeach or discredit a witness does not compel the granting of a new trial [citation], and a new trial will not ordinarily be granted for newly discovered evidence of that character. [Citation.] While it is true that the granting of a new trial upon the discovery of highly material impeaching evidence will not be held to constitute an abuse of discretion [citation], when the trial court denies such a motion, the reviewing court should not ordinarily interfere." (*People v. Moten* (1962) 207 Cal.App.2d 692, 698.)

Here, the trial court acted well within its discretion when it found that the revelation about Pfeiffer's call to the DA Funk after the trial may demonstrate Pfeiffer was "smarmy for trying to get some after the fact, but . . . the fact that he weaseled around and tried to convince the District Attorney . . . to do something after the fact to help his girlfriend out is [not] a basis to conclude that there should be a new trial." At trial, Pfeiffer was asked if anyone offered him any benefit or if he was aware of any benefit to himself for testifying, and he said no. The People also asked if anyone offered him anything in exchange for his testimony in the case, and he said no. That *after* the trial occurred, Pfeiffer decided he would approach DA Funk about his girlfriend's case does not necessarily mean he was thinking about her case *during* the trial. Indeed, there was no evidence presented that Pfeiffer knew about the charges against his girlfriend at the time of the trial. Thus, defendant cannot show the trial court abused its discretion in denying his request for a new trial based on the fact that Pfeiffer called DA Funk and sought a favor for his girlfriend after the trial.

## VIII

### *There Is No Cumulative Error*

Defendant asserts the errors he alleges occurred at trial constitute cumulative error that deprived him of his federal and state constitutional rights to due process and a fair trial.  We disagree.  In each case of asserted error at trial we have found either no error or that any possible error was not prejudicial.  As such, the cumulative effect of any possible errors is not prejudicial.  (See *People v. Eubanks* (2011) 53 Cal.4th 110, 152 ["[h]aving found only minor harmless errors during defendant's trial, we reject her claim of cumulative effect"].)

### DISPOSITION

We affirm the trial court's judgment and its denial of a motion for new trial.

              _____

              HULL, J.

We concur:

_____

BLEASE, Acting P. J.

_____

DUARTE, J.